A99A2225. PATTERSON v. SOUTHEASTERN NEWSPAPERS, INC.
A99A2238. LEWIS v. SOUTHEASTERN NEWSPAPERS, INC.
(533 SE2d 119)

POPE, Presiding Judge.

Generally, an employer is not liable for injuries caused by its employees during their commute to or from work but may be liable where an employee is on a special mission at the direction of the employer. Mariko Patterson's husband was struck and killed by an employee of Southeastern Newspapers, Inc. while the employee was driving home after delivering newspapers as a substitute for the assigned carrier who was ill. The main issue in this case is whether Southeastern should be held liable for the employee's negligence when the employee was called in outside of his regular hours to cover for a missing employee. Because there are facts supporting the conclusion that the employee was on a special mission for Southeastern, the trial court improperly granted summary judgment for the newspaper.[1]

Construed in favor of Patterson, the facts show that Joshua Bourgoin was a salaried, full-time employee of Southeastern at the time of the accident. His title was "relief district manager," and his regular duties included overseeing distribution points for newspaper delivery carriers in place of absent district managers. He oversaw distribution points on Monday and Tuesday mornings from either 2:30 or 4:30 a.m. to 9:30 a.m. He made sure carriers came to work and got their newspapers, he took care of complaints, and he covered for absent drivers. But he delivered papers only if one of the carriers did not show up. On Monday and Tuesday he also attended a meeting at the office from 9:30 to 10:30 a.m. On Wednesday he attended a meeting beginning at 10:30 a.m. and had a "solicitation meeting" that involved soliciting sales in the afternoon.

For the remainder of the week he was on call. On those days, if called to do so, he covered for district managers who could not report to work, or he "threw" a route if a carrier did not show up and the district manager was already covering for another missing carrier. Bourgoin might learn he was needed for such an assignment as early as Monday or Tuesday, but he often received a call the night before, and sometimes the call came an hour before he was needed. If he had other plans, he was not required to come in. He was not called for this type of work every week. He did not receive extra pay for this work. Southeastern acknowledges that his assigned hours varied week to week depending on whether and to what extent he was called

---

[1] Patterson and Sandra Lewis as executrix of the estate of Jack Patterson filed two factually identical lawsuits, both of which were dismissed on summary judgment. The two appeals raise the identical issues and are hereby consolidated for the purposes of appeal.

in after Wednesday and that he was not required to punch a clock. Bourgoin was salaried, but he also received a fixed "automobile allowance" of approximately $184, every two weeks, based on an estimate by Southeastern of the amount he would have to drive his car during the course of his duties.

On Wednesday night, January 7, 1998, Bourgoin got a call to cover for a carrier on Thursday morning. He was not scheduled to go in that day. He finished the route around 6:00 a.m. and headed home. On the way, his car struck and killed 67-year-old Jack Patterson.

1. The general rule of respondeat superior holds: "When a servant causes an injury to another, the test to determine if the master is liable is whether or not the servant was at the time of the injury acting within the scope of his employment and on the business of the master. [Cits.]" *Allen Kane's Major Dodge v. Barnes*, 243 Ga. 776, 777 (257 SE2d 186) (1979). With regard to commuting to and from work, the general rule is that the employee is acting for himself at that time and, therefore, the employer is not to be held liable for an injury occurring during that time. *Jones v. Aldrich Co.*, 188 Ga. App. 581, 583 (1) (373 SE2d 649) (1988).

However, there is an exception to the general rule where the employee undertakes a special mission at the direction of the employer. *Aldrich*, 188 Ga. App. at 583 (1). As stated in *Aldrich*,

> Where the employee, before or after customary working hours, is on his way home after performing, or on the way from his home to perform, some special service or errand or the discharge of some duty incidental to the nature of his employment in the interest of, or under direction of, his employer, and an injury arises en route from the home to the place where the work is performed, or from the place of performance of the work to the home, such injury is considered as arising out of and in the course of the employment.

(Citations and punctuation omitted.) Id.

Although Southeastern contends that Bourgoin was not on call but merely driving home from his regularly assigned duties, the facts could support the conclusion that the exception found in *Aldrich* is applicable here. That exception requires "that the errand or mission itself be a 'special' or uncustomary one, made at the employer's request or direction." *Hargett's Tel. Contractors v. McKeehan*, 228 Ga. App. 168, 170 (491 SE2d 391) (1997).

Construing the facts in favor of Patterson, Bourgoin was not scheduled to go to work on Thursdays. When he was called he did not have a set route; he filled in wherever the need arose. He was not merely being called to report to his regular distribution point or to

take care of his normal assignment. Rather, on this particular occasion, he was called on short notice to go directly to a distribution point where there was a need. It is true that being called in was not uncommon, but it still required a special request by Southeastern. Southeastern also gained an incidental benefit from the arrangement. By putting Bourgoin on call in his own car, Southeastern created for itself a flexible way of covering for missing employees in the middle of the night. This benefit would not result from ordinary commuters with regular schedules. When he completed the assignment, Bourgoin proceeded directly toward home from where he found himself when he finished throwing the route.

The facts in favor of Southeastern suggest that Bourgoin's on-call day was very much like his regular work day, the main difference being that on this particular day he did not know where he was going until he got the call to report.

Although reasonable minds could differ, there is an issue of fact as to whether Bourgoin was acting in the scope of his employment when he went in on Thursday morning, and therefore the court erred in granting summary judgment to Southeastern on this legal theory.

*Schofield v. Cox Enterprises*, 212 Ga. App. 354 (441 SE2d 693) (1994), is not controlling. There the employee was on his way home from his scheduled daily work and on a personal errand. Id. at 354. *Marketing Sales Indus. &c. v. Roberts*, 118 Ga. App. 718 (165 SE2d 319) (1968), is also distinguishable. There the employee was traveling home after being off duty for a period of time during which he stopped for two drinks at a bar. Id.

We find support for this result in two cases from other jurisdictions facing similar facts. In *Evington v. Forbes*, 742 F2d 834 (4th Cir. 1984), the Fourth Circuit applying North Carolina law held that where an on-call hospital employee had an accident while en route to the hospital in response to an emergency call, the facts supported the conclusion that he was operating in the scope of his employment. One distinction in *Evington*, however, is that the employee was paid overtime for his on-call work. Id.

In *Robinson v. George*, 16 Cal.2d 238 (105 P2d 914) (1940), the Supreme Court of California held that there was an issue of fact whether a newspaper delivery person was acting within the scope of his duties when, outside of his regular hours, he was on call to deliver newspapers to addresses missed by the regular carrier. The high court noted the standard rule — that an employee going to or from work is not considered to be acting in the scope of his employment. But because the employee had to remain on call and make deliveries as ordered, these calls could be considered special errands and therefore an exception to the general rule. In *Robinson*, as in *Evington*, the employee was paid for the extra work.

Although Bourgoin was not paid extra for his on-call assignments, he was salaried and received a fixed automobile allowance. Both forms of compensation could have been intended to compensate Bourgoin for his regular and on-call work. Thus, the distinction noted above for *Evington* and *Robinson* does not control this case.

We do not hold that the mere fact that Bourgoin was on call means that he was acting within the scope of his employment. See *Sherar v. B & E Convalescent Center*, 49 Cal.App.3d 227, 229 (122 Cal. Rptr. 505) (1975) ("on-call" employee reporting to her regular shift was not acting within scope of employment); *Ehlenfield v. State*, 404 NYS2d 175 (N.Y. 1978) ("on-call" police officer not acting in scope of employment when involved in accident while bringing refrigerator to station). Rather, construing the facts in favor of Patterson, Bourgoin was within the scope both because he was responding to an actual call at the time of the accident and because the call itself was in the nature of a special errand or mission.

2. Patterson also contends that Southeastern was negligent in hiring and retaining Bourgoin as a driver, as well as calling him to drive at 4:30 a.m. without sufficient notice. Although Southeastern did some investigation of Bourgoin before hiring him, Patterson contends it was inadequate and that Southeastern should have discovered his checkered driving record as well as his continued driving violations during the time he was employed by Southeastern.

Southeastern hired Bourgoin on July 9, 1997. Prior to hiring him, Southeastern, in accordance with its policy, made a request for an "AMS driver record service report" for Bourgoin from a private company named Palmer & Caye Carswell. That report revealed that Bourgoin had a clean record for the preceding three years. The human resources department is responsible for requesting the motor vehicle report. The human resources director testified that if the report had shown that Bourgoin had a suspended license or violations that would result in insurance cancellation, his employment would have been terminated. But she would not discharge an employee if the report showed only speeding or driving too fast for conditions. The human resources director also testified that she did not know what "AMS" stood for or how far back in time such a report went. And she said that she had no training in what level of investigation ought to be made. Finally, the newspaper has a policy of updating driving information once a year in the employee's month of hire. So, Southeastern was scheduled to request another report on Bourgoin in July 1998.

Bourgoin, who was 23 years old both when hired and at the time of the accident, testified that he had numerous driving violations over a period of seven years before he was hired, although only one, a speeding ticket, occurred in the three years immediately preceding

his employment. There was also evidence that in September 1997, Bourgoin pleaded guilty to speeding. He admitted to coming to work "late and drunk" on one occasion. And, at the time of the accident, unbeknownst to Southeastern, his license was suspended as a result of a citation for driving under the influence. He did not inform the newspaper of this incident despite agreeing at the time of his employment to tell of any "major citations . . . (i.e., suspended license, canceled insurance)." Southeastern obtained another "AMS" report for Bourgoin after the accident, and it shows a conviction for speeding in September 1997 and the DUI conviction in December 1997, together with an indication that his license had been suspended.

"The appropriate standard of care in a negligent hiring/ retention action is whether the employer knew or should have known the employee was not suited for the particular employment." *Kemp v. Rouse-Atlanta*, 207 Ga. App. 876, 878 (1) (429 SE2d 264) (1993).

*Green v. Johnston Realty*, 212 Ga. App. 656, 659 (3) (442 SE2d 843) (1994). See also *Cherry v. Kelly Svcs.*, 171 Ga. App. 235, 236 (2) (319 SE2d 463) (1984); OCGA § 34-7-20. In *Cherry*, we held that the employer's actual knowledge of one traffic violation created a question of fact as to whether the employer should have inquired further into an employee's driving record before hiring him. See also *Sparlin Chiropractic Clinic v. TOPS Personnel Svcs.*, 193 Ga. App. 181 (1) (387 SE2d 411) (1989) (issue of fact exists where plaintiff produced some evidence that employer should have known of employee's improper past conduct). Compare *Bunn-Penn v. Southern Regional Med. Corp.*, 227 Ga. App. 291, 294 (2) (488 SE2d 747) (1997) (hospital's knowledge of employee's questionable conduct around female patients did not put hospital on notice that employee had propensity to commit sexual assault).

But here, Patterson failed to present any evidence that Southeastern knew or should have known of Bourgoin's bad driving record. Although Bourgoin testified that he had numerous prior violations, Patterson did not put in any valid evidence that Bourgoin's official driving record reflected any of the alleged driving infractions at the time that Southeastern investigated Bourgoin's record. Nor did Patterson put forward any evidence to show that Southeastern's investigation procedures were faulty or not reasonable under the circumstances.

"In response to a motion for summary judgment, the non-moving party may not rest on generalized allegations, but must come forward with specific facts. . . ." *Precise v. City of Rossville*, 261 Ga. 210, 212 (3) (403 SE2d 47) (1991). Southeastern showed that it inves-

tigated Bourgoin's past driving record before hiring him and found nothing. Even though Bourgoin testified to numerous driving violations, Patterson has put forth no evidence to show that a more thorough search of the motor vehicle records in July 1997 would have revealed them. She has not shown that any of Bourgoin's earlier offenses were in fact on his record at the time or that a reasonable investigation would have uncovered them. The only evidence Patterson offered is that on April 7, 1999, three months after the fatal accident, Bourgoin's driving record showed one speeding ticket before his date of hire. But again, there is no evidence that this violation was on his record in 1997. Also, Patterson has no evidence that the "AMS" report prepared by Palmer & Caye Carswell was not accurately and thoroughly prepared or that there was any reason that Southeastern should not have relied on it. Because there is no evidence that Southeastern should have known of Bourgoin's earlier bad driving record, the claim for negligent hiring fails.

Similarly, Patterson's claim of negligent retention fails. Southeastern had a procedure in place to check the driving record of employees who drove as a part of their job. There is no indication that Southeastern did not follow its procedures. Also, Patterson has not suggested a procedure that would have revealed the license suspension within the 11 days that elapsed between the suspension and the accident. Nor has Patterson shown when the September 1997 speeding ticket first appeared on Bourgoin's record.

Finally, Patterson has put forward no evidence to support her claim that calling Bourgoin on the night before to fill in on the fateful morning is in and of itself negligent.

*Judgments affirmed in part and reversed in part. Smith and Miller, JJ., concur.*

DECIDED MARCH 29, 2000.

*Warlick, Tritt & Stebbins, Charles C. Stebbins III*, for appellants.
*Dye, Tucker, Everitt, Wheale & Long, A. Rowland Dye, Barrickman, Allred & Young, Fredric S. Young*, for appellee.