**FIRST DIVISION
BARNES, P. J.,
MERCIER and BROWN, JJ.**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules

**October 17, 2019**

# In the Court of Appeals of Georgia

A19A1176. CENTURION INDUSTRIES, INC. v. NAVILLE-SAEGER et al.

A19A1177. CENTURION INDUSTRIES, INC. v. SMITHWICK.

MERCIER, Judge.

While on unpaid leave from work, Jeremy Carter drove from a work site in Arabi, Louisiana to Valdosta, Georgia. As Carter was driving in Lowndes County, Georgia, he caused a motor vehicle collision when he hit a vehicle containing Kyle Naville and Logan Shelly. Tragically, both Naville and Shelly died as a result of the collision. The parents of Naville brought an action against Centurion Industries, Inc. (Carter's employer) and Carter, and the mother of Shelly filed a separate action against Carter and Centurion.

Centurion filed motions for summary judgment in both lawsuits, arguing that Carter was not acting in the course and scope of his employment when the collision

occurred, and therefore Centurion could not be held liable under theories of respondeat superior or negligent hiring and retention. The trial court denied Centurion's motions in the two cases in a single order. We granted Centurion's applications for interlocutory appeals[1] to review the trial court's order, and for the following reasons, we reverse.

"On appeal from a trial court's grant [or denial] of summary judgment, our review of the record is de novo, and we construe the facts and all inferences drawn from them in the light most favorable to the nonmoving party." *Farzaneh v. Merit Constr.*, 309 Ga. App. 637 (710 SE2d 839) (2011) (citation omitted).

In 2015, Carter lived in Valdosta and worked as a millwright for A-Lert Construction Services, a division of Centurion, out of its Valdosta, Georgia office.[2] Amongst other services, Centurion performed "shutdown work," where a factory would shut down for multiple weeks and Centurion would perform maintenance work at the factory. Carter was assigned to a "road crew," where he and other Centurion employees traveled to out-of-town job sites.

---

[1] Carter is not a party to these appeals.

[2] For the purpose of clarity, we will refer to A-Lert and Centurion collectively as "Centurion."

In 2014, Centurion entered into a contract to perform construction work at a refinery in Arabi, Louisiana. Carter was assigned to work at the Arabi job site, along with four other Valdosta-based Centurion employees and a supervisor. He received hourly pay, mileage reimbursement for his travel to the Arabi job site from Centurion's office in Valdosta and a per diem payment for each day he worked at the Arabi job site. Due to the distance between the Arabi job site and Centurion's Valdosta office, the Centurion employees secured temporary housing near the job site and were expected to remain near the job site for the duration of the assignment.

Prior to arriving in Arabi, Carter requested and received permission to take unpaid leave from work for February 25, 2015 through February 27, 2015. Carter wrote on the request form that he needed the leave for "[c]ourt." Centurion did not request that Carter perform any tasks during the leave period.

Carter drove from Valdosta to Arabi in his own vehicle and began working at the site on February 2, 2015. Some of the other Centurion employees carpooled to the Arabi job site. At the time, Carter did not have a valid driver's license, and due to requirements issued by the refinery he was unable to drive a vehicle onto the refinery property in Arabi. As a result, he rode to the site with another Centurion employee.

While he was in Arabi, Carter told his field supervisor that he had to take leave to return to Valdosta "because of a DUI refusal in North Carolina." Carter did not receive any compensation, including per diem, travel allowances, or mileage reimbursement, while he was on leave. On February 25, 2015, the first day of Carter's unpaid leave, Carter drove his personal vehicle from Arabi to Valdosta, where he attempted to pass a school bus and hit the oncoming vehicle in which Naville and Shelly rode. After the collision, Carter's blood tested positive for alcohol content of .187 grams per 100 milliliters. Centurion did not terminate Carter's employment because he "hadn't been to trial," but it removed him from the road team and required him to work out of the Valdosta office. Carter eventually pled guilty to two counts of vehicular homicide in connection with the collision.

Centurion appeals the trial court's denial of its motions summary judgment, arguing that Carter was not acting within the scope of his employment at the time of the collision, and therefore the Plaintiffs' respondeat superior claims fails; and that the trial court erred by denying its motions on the Plaintiffs' negligent hiring and retention claims because Carter's trip to Valdosta was wholly unrelated to his employment.

1. Every master shall be liable for torts committed by "his servant by his command or in the prosecution and within the scope of his business, whether the same are committed by negligence or voluntarily." OCGA § 51-2-2. "When a servant causes an injury to another, the test to determine if the master is liable is whether or not the servant was at the time of the injury acting within the scope of his employment and on the business of the master." *Hicks v. Heard*, 286 Ga. 864, 865 (692 SE2d 360) (2010) (citation omitted). "The test is not that the act of the servant was done during the existence of the employment, but whether the servant was at that time serving the master." *Hargett's Telephone Contractors v. McKeehan*, 228 Ga. App. 168, 169 (491 SE2d 391) (1997) (citation, emphasis and punctuation omitted).

> While a jury frequently must resolve whether an employee acted in furtherance of his master's business and within the scope of his employment at the time an injury was inflicted, the evidence in some cases is so plain and undisputable that the court may resolve a respondeat superior claim as a matter of law.

*Farzaneh*, supra at 639 (citation omitted). "[S]ummary judgment for the master is appropriate when the evidence shows that the servant was not engaged in furtherance of his master's business but was on a private enterprise of his own." *Lucas v.*

5

*Beckman Coulter, Inc.*, 348 Ga. App. 505, 508 (2) (823 SE2d 826) (2019) (citation and punctuation omitted).

There is a longstanding general rule that an employee is engaged in a purely personal matter while commuting to or from work. See *Farzaneh*, supra; *Patterson v. Southeastern Newspapers*, 243 Ga. App. 241, 242 (1) (533 SE2d 119) (2000). At the time of the collision, Carter was driving to Valdosta from the Arabi job site on the first day of his approved unpaid leave from work. Moreover, he was driving his own vehicle, so no presumption arises that he was acting within the scope of his employment. See *Gassaway v. Precon Corp.*, 280 Ga. App. 351, 355 (634 SE2d 153) (2006) ("Under Georgia law, when an employee is involved in a collision while operating his employer's vehicle, a presumption arises that he is acting within the scope of his employment.") (citation omitted). Tellingly, Carter testified that he was not planning on stopping at Centurion's office in Valdosta on the date of the collision because he did not "see a reason why I would even have needed to stop by there being that I was, you know, off work." Carter also testified that he had no Centurion property in his vehicle at the time of the collision. As Carter was on authorized unpaid leave from work in order to tend to a personal matter and had driven back to Valdosta in his own vehicle, he was presumed to be engaged in a personal matter at

6

the time of the collision. See *Farzaneh*, supra; compare *Intl. Bus. Machine v. Bozardt*, 156 Ga. App. 794, 798-799 (275 SE2d 376) (1980) (a question of fact remained as to whether the employee was in the scope of employment when he caused a collision while driving to dinner in a rental vehicle paid for by his employer during an out-of-town work conference; this Court looked to workers' compensation law for the principle that while an employee traveling for work purposes is "lodging in a hotel or preparing to eat, or while going to or returning from a meal, he is performing an act incident to his employment, unless he steps aside from his employment for personal reasons").

While, as a general rule, an employee is deemed to act only for his own purposes while commuting to or from work, an exception exists where an "employee undertakes a special mission at the direction of the employer. The special mission must be made at the employer's request or direction." *Gassaway*, supra at 353 (citations and punctuation omitted). Under the "special mission" exception,

> where the employee, before or after customary working hours, is on his way home after performing, or on the way from his home to perform, some special service or errand or the discharge of some duty incidental to the nature of his employment in the interest of, or under direction of, his employer, and an injury arises en route from the home to the place where the work is performed, or from the place of performance of the

7

work to the home, such injury is considered as arising out of and in the course of the employment.

Id. (citation and punctuation omitted).

Here, as in *Gassaway*, supra, the evidence demonstrates that Carter requested and received time off for a personal matter. In *Gassaway*, the employee requested an extended lunch period to find more suitable temporary housing while staying away from his home for work. Id. at 352. This Court affirmed summary judgment for the employer, holding that the employee was not acting in the course and scope of his employment when he caused a collision as he turned into the job site after running his personal errand. Id. at 352. In the present matter, Carter planned to perform his personal errand during his three days of unpaid leave. While the errand of attending court for the purpose of attempting to have his driver's license reinstated might have benefitted Centurion if Carter had regained his license, Carter was not obligated by Centurion to perform the errand. See id. at 354. Having a valid driver's license was not a requirement of Carter's job, and Carter's employment would not have been imperiled had he not obtained his license. See id. The primary beneficiary of Carter taking leave and attempting to regain his drivers's license was Carter himself. See id.

8

The Plaintiffs argue that the very act of Carter working at the Arabi site was a special mission, so the collision, which occurred as Carter returned to Valdosta from the Arabi site, arose out of and in the course of his employment. However, the Plaintiffs admit that Carter was a member of Centurion's road crew, "which travel[ed] to various states" to perform its work. "[T]he special mission exception requires that the errand or mission itself be a special or uncustomary one, made at the employer's request or direction." *Farzaneh*, supra at 643 (citations and punctuation omitted). Here, Carter's job was to work as a millwright on the Centurion road crew, wherein he traveled to different job sites to perform work until it was completed. Carter working at the Arabi job site was not "special, or uncustomary." See id. (affirming summary judgment to employer in a case involving a construction employee who struck and injured a pedestrian while driving his own vehicle to an assigned job site from his home; holding that "in commuting to an assigned job site as he did every day of the work week, [the employee] was not on an errand or mission that could be characterized as special or uncustomary"); *Hargett's*, supra at 171 (reversing denial of employer's motion for summary judgment because employee's conduct in traveling to multiple job sites, as his job normally required, could "in no way be considered a 'special mission' or errand done at the direction of his employer") (citation omitted);

9

*Banks v. AJC Intl.,* 284 Ga. App. 22, 24-25 (2) (643 SE2d 780) (2007); *Mastec North America v. Sandford*, 330 Ga. App. 250, 256-257 (1) (765 SE2d 420) (2014).

The Plaintiffs also point to Carter's testimony that his wife told him that on the day of the collision he had told her that he planned to go to a store to purchase new work boots before heading home. "An employee cannot unilaterally determine to undertake a special mission." *Wood v. B & S Enterprises*, 314 Ga. App. 128, 131 (1) (723 SE2d 443) (2012). The directive to buy new work boots must have come from the employer, and there was no evidence that Carter had undertaken a special mission at Centurion's request at the time of the collision. See id. Furthermore, the errand of obtaining work boots "could have been accomplished at any time. Accordingly, the errand[] cannot be considered a 'special mission.'" *Gassaway*, supra at 354.

For these reasons, the trial court erred in denying Centurion's motions for summary judgment regarding the Plaintiffs' claims based on the doctrine of respondeat superior. Although the underlying facts of this case are tragic, the uncontroverted evidence shows that at the time of the collision, Carter was engaged in the purely personal matter of driving to Valdosta while on unpaid leave from work and, therefore, was not acting in the course and scope of his employment. It follows that, as a matter of law, Centurion cannot be held vicariously liable for the Plaintiffs'

10

deaths under the doctrine of respondeat superior. See generally *Farzaneh*, supra at 643-644.

2. Centurion argues that Carter's trip to Valdosta was "wholly unrelated" to his employment, and therefore the trial court erred by denying its motions for summary judgment on the Plaintiffs' negligent hiring and retention claims. Unquestionably, prior to the collision Carter had a history of violating driving laws, including refusing to submit to driving under the influence testing, driving with an open container of alcohol, speeding, and driving with a suspended driver's license. There is also no dispute that Centurion had actual knowledge of at least some of Carter's driving violations.

"[A] defendant employer has a duty to exercise ordinary care not to hire or retain an employee the employer knew or should have known posed a risk of harm to others where it is reasonably foreseeable from the employee's tendencies or propensities that the employee could cause the type of harm sustained by the plaintiff." *Munroe v. Universal Health Svcs.*, 277 Ga. 861, 863 (1) (596 SE2d 604) (2004) (citations and punctuation omitted). However,

> [f]or an employer to be liable for an automobile accident under the
> theory of negligent hiring and retention where, as here, the allegation is

11

that the employee had a bad driving record and where the injured driver was merely a member of the general public on the public highway, the accident could not have occurred while the employee was simply commuting to work but had to occur while the employee was engaged in the employer's business.

*CGL Facility Mgmt. v. Wiley*, 328 Ga. App. 727, 731 (2) (a) (760 SE2d 251) (2014) (citation and punctuation omitted). Because Carter was not engaged in Centurion's business when he caused the collision in Lowndes County, Centurion was also entitled to summary judgment on the Plaintiffs' claims that were based on the theory of negligent hiring and retention. See id.; *Dougherty Equip. v. Roper*, 327 Ga. App. 434, 438 (1) (b) (757 SE2d 885) (2014).

*Judgment reversed. Barnes, P. J., and Brown, J., concur.*